# No. 22-3106

---

## In the United States Court of Appeals for the Second Circuit

---

MARIO CERAME and TIMOTHY C. MOYNAHAN,

Plaintiffs-Appellants,

v.

MICHAEL P. BOWLER, in his official capacity as Connecticut Statewide Bar Counsel; and MATTHEW G. BERGER, in his official capacity as Chair of the Statewide Grievance Committee,

Defendants-Appellees,

---

On Appeal from the United States District Court
for the District of Connecticut
No. 3:21cv-01502-AWT; Hon. Alvin Thompson

---

**BRIEF OF *AMICI CURIAE* THE NATIONAL LEGAL FOUNDATION, PACIFIC JUSTICE INSTITUTE, AND JUSTICE & FREEDOM LAW CENTER**
*Supporting Appellants and Urging Reversal*

---

Kevin T. Snider
 Counsel of Record for *Amici Curiae*
Pacific Justice Institute
P.O. Box 276600
Sacramento, CA 95827
(916) 857-6900
ksnider@pji.org

March 3, 2023

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae*, The National Legal Foundation, Pacific Justice Institute, and Justice & Law Center, have not issued shares to the public, and no *Amicus* has any parent company, subsidiary, or affiliate that has issued shares to the public. Thus, no publicly held company can own more than 10% of stock.

Table of Contents

Table of Authorities ................................................................. iii

Interests of the *Amici Curiae* ...................................................1

Summary of Argument ...............................................................2

Argument...................................................................................3

I.   The District Court Misapplied Standing Precedent.............................3

II.  Recent Events Demonstrate That theThreat of Rule 8.4(7)
     Is Very Real ................................................................9

III. The Very Purpose of Rule 8.4(7) Is to Target Those Who Hold
     Sincerely Held Religious Views That Are Scientifically Informed ..................18

Conclusion .............................................................................24

Table of Authorities

<u>Cases</u>

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ..........................................4

*Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ....................................4

*Basler v. Downtown Hope Ctr.,* Case No. 18-167,
(Anchorage Equal Rights Comn'n, May 15, 2018)................................................21

*Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661 (2010) .........................21

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2014)..................................................4

*D.C. v. Heller,* 554 U.S. 570 (2008) ..........................................................................7

*Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246 (2020).......................................10

*Franciscan Alliance v. Bacerra,* 47 F.4th 368 (5th Cir. 2022)................................6

*Golden v. Zwickler*, 394 U.S. 103 (1969) ..................................................................4

*In re Idaho State Bar Resolution 21-01* (Idaho S. Ct., Jan. 20, 2023),
*available at* http://isc.idaho.gov/opinions/50356.pdf..........................................23

*Lawrence v. Tex.*, 539 U.S. 558 (2003) ...................................................................20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................... 3, 7, 8

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ..................................................8

*Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n,*
138 S. Ct. 1719 (2018)..........................................................................................21

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ....................................................................19

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ......................................9

*Obergefell v. Hodges,* 576 U.S. 644 (2015)..............................................................15

*Otto v. Boca Raton*, 981 F.3d 854 (11th Cir. 2020)........................................... 18-19

*Our Lady of Guadalupe Sch. v. Morrisey-Berru*,
   140 S. Ct. 2049 (2020)..........................................................................................10

*Parents Involved in Community Schools v. Seattle School District
   No. 1*, 551 U.S. 701 (2007)................................................................................ 5-6

*Parker v. Judicial Inquiry Comm'n of Ala.*,
   2017 WL3820958 (M.D. Ala., Aug. 31, 2017) ....................................................16

*Parker v. Judicial Inquiry Comm'n of Ala.,*
   295 F. Supp. 3d 1292 (M.D. Ala. 2018)...............................................................16

*Religious Sisters of Mercy v. Bacerra*,
   55 F.4th 583 (8th Cir. 2022) ............................................................................ 6-7

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) .........................5

*Steffel v. Thompson*, 415 U.S. 452 (1974) .................................................................4

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).....................................4, 5

*Tex. v. Johnson*, 491 U.S. 397, 414 (1989) ..............................................................19

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..................................... 4, 6, 9

*Whitney v. Cal.*, 274 U.S. 357 (1927) ......................................................................19

<u>Rules</u>

Conn.R.P.C. 8.4(7)........................................................................................ *passim*

<u>Other Authorities</u>

ABA Ethics Committee, Dec. 22, 2015, memo. at 2, *found at*
   https://www.americanbar.org/content/dam/aba/administrative/
   professional_responsibility/rule_8_4_language_choice_memo_
   12_22_2015.authcheckdam.pdf.............................................................................18

Josh Blackman, Response to ABA Formal Opinion 493 on Model Rule
   8.4(g), *found at* https://reason.com/2020/07/15/aba-issues-formal-
   opinion-on-purpose-scope-and- application-of-aba-model-rule-8-4g/
   (July 15, 2020) ..................................................................................23

Theodore Dalrymple, "Scotland's Emerging Totalitarian Democracy,"
   *found at* https://lawliberty.org/scotlands-emerging-totalitarian-democracy/
   (Jan. 6, 2021)....................................................................................17

Frederick Douglass, *Autobiographies* 207 (Library of Am. 1994).........................16

https://freedomforallamericans.org/states/........................................................ 23-24

https://harpers.org/a-letter-on-justice-and-open-debate .................................17

https://lalegalethics.org/wp-content/uploads/2017-09-08- LA-AG-
   Opinion-17-0114-re-Proposed-Rule-8.4f.pdf?x16384 .........................22

https://law.stanford.edu/directory/michael-w-mcconnell/ ......................................10

https://www.clsnet.org/document.doc?id=1145 ......................................................22

https://www.c-span.org/video/?476316-6/barrett-confirmation-hearing
   -day-2-part-3 ....................................................................................17

https://www.law.state.ak.us/pdf/press/190809-Letter.pdf .......................................22

https://www.scag.gov/wp-content /uploads/ 2017/05/McCravy-J.
   - OS-10143-FINAL-Opinion-5-1-2017-01331464xD2 C78-
   01336400xD2C78.pdf........................................................................22

https://www.tn.gov/content/dam /tn/attorneygeneral /documents/ops/
   2018/op18-11.pdf..............................................................................22

https://www2.texasattorneygeneral.gov/ opinions/opinions/51paxton
   /op/2016/kp0123.pdf..........................................................................22

https://www.washingtonpost.com/local/education/ georgetown-law-
  sandra-sellers-black-students/2021/03/11/c798eae0-827d-11eb-
  ac374383f7709 abe_story.html ..........................................................................15

John Inazu, "Scholarship, Teaching, and Protest," *found at*
  https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6469
  &context=law_lawreview ...............................................................................12

*John* 8:2-11 (ESV). ..........................................................................................20-21

Caroline Lowbridge, "We're being pressured into sex by some
  transwomen" (Oct. 26, 2021), *found at* https://www.bbc.com/news/
  uk-england-57853385 ......................................................................................22

Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8
  (Fall 2016)...................................................................................................19-20

Michael W. McConnell, "Statement to Stanford Law School Community"
  (May 29, 2020) *found at* https://wustllawreview.org/2021/10/23/statement
  -by-michael-mcconnell-to-stanford-law-school-community/ ........................10-11

Michael McGinniss, *Expressing Conscience with Candor: Saint Thomas
  More and First Freedoms in the Legal Profession*, 42 Harv. J.L. & Pub.
  Pol'y 173 (2019), *found at* https://law.und.edu/_files/docs/features/
  mcginniss-expressingconsciencewithcandorharvard jlpp-2019.pdf....................23

Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics: The Lawyer's
  Deskbook on Professional Responsibility*, "§ 8.4-2(j) Racist, Sexist, and
  Politically Incorrect Speech" & "§ 8.4-2(j)-2. The New Rule 8.4
  and the Free Speech Problems It May Raise" in "§ 8.4-2 Categories of
  Disciplinable Conduct" (Apr. 2017 ed.)...............................................................23

"Statement by the Undersigned Editors of Vol. 97," *found at*
  https://cdn.wustllawreview.org/wp-content/uploads/0A-Issue-6-
  Statement.pdf?x72270 ......................................................................................12

Eugene Volokh, *A Nationwide Speech Code for Lawyers?*, The Federalist
  Society (May 2, 2017), *found at* https://www.youtube.com/watch?v=
  AfpdWmlOXbA....................................................................................................23

Interests of the *Amici Curiae*[1]

The **National Legal Foundation** (NLF) is a public interest law firm dedicated to the defense of First Amendment liberties, including the freedoms of speech, assembly, and religion. The NLF and its donors and supporters, in particular those from Connecticut, are vitally concerned with the outcome of this case because of its effect on the free exercise, speech, and assembly rights of individuals. It previously filed comments concerning Connecticut's proposed adoption of a rule based on ABA Rule 8.4(g), which became Rule 8.4(7).

The **Pacific Justice Institute** (PJI) is a non-profit legal organization established under section 501(c)(3) of the Internal Revenue Code. Since its founding in 1997, PJI has advised and represented in court and administrative proceedings thousands of individuals, businesses, and religious institutions, particularly in the realm of First Amendment rights. As such, PJI has a strong interest in the development of the law in this area. PJI and its counsel have and will continue to represent clients in matters that are similar to those identified by the Plaintiff Attorneys.

The **Justice & Freedom Law Center** (JFLC) is a public interest law firm

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

based in Illinois that exists to advance life, faith, family, and religious freedom in public policy and culture from a Christian worldview. A core value of JFLC is to uphold religious freedom and conscience rights for all individuals and organizations. JFLC is vitally concerned with the outcome of this case because of its effect and implications on the free exercise of religion, freedom of speech, and freedom of assembly rights of individuals. The ABA has pushed for Illinois to adopt its model Rule 8.4(g), as Connecticut has done in modified form.

Summary of Argument

It was once remarked of an author, "He has read all the right books and has come to all the wrong conclusions." In this case, the district court has cited all the right precedent and has consistently misapplied it.

Standing is not determined by an exercise, such as the district court engaged in here, of looking to the merits and deciding that the plaintiffs have nothing to worry about if they are brought into the dock. This is particularly true when a member of the public can trigger an adversarial proceeding. Here, Plaintiff Attorneys have more than adequately alleged that Connecticut's new Rule 8.4(7) may be used by those who consider themselves aggrieved by plaintiffs' speech to enmesh them in adversary proceedings. Their allegations are consistent with the stated purpose of the rule, and the reality of the threat to them is demonstrated by recent incidents. They have standing to ward off such threats.

<u>Argument</u>

I.   <u>The District Court Misapplied Standing Precedent</u>

Plaintiff Attorneys have standing because they are part of the group threatened with enforcement under Rule 8.4(7).  The threatened target group is defined by the rule itself—attorneys who might say something considered disparaging or harassing to various persons.  Thus, attorneys like plaintiffs—who allege that they hold to, and speak in favor of, many positions thought to be discriminatory and harassing by others in our society—have standing to complain that they may be subject to proceedings under the rule.  As the Supreme Court instructed in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992),

> [w]hen the suit is one challenging the legality of government action or inaction, standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Id*. at 561-62.  So it is here.  Plaintiff Attorneys are not restricted to bringing suit after disciplinary complaints have been filed against them.

The district court concluded that Plaintiff Attorneys' alleged injury is too speculative.  Not under the Supreme Court's precedent.  The standing inquiry does not jump to the merits and prognosticate the likely result of an enforcement action if one is brought.  It recognizes that having to go through an enforcement action is itself injury, as is the chill that leads to avoidance of constitutionally protected

- 3 -

activity for fear of prosecution, even if ultimately unsuccessful. For example, in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), the Supreme Court found standing based on the potential of further enforcement actions in future elections, actions and investigations that could be triggered by complaints filed by private parties, like here. The Court explained that injury in fact is satisfied when "threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Id.* at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 437 (2014)) (internal quotation marks omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021); *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626-27 (D.C. Cir. 2017) ("[A] plaintiff can establish standing by satisfying *either* the 'certainly impending' test *or* the 'substantial risk' test." (emphasis in original)).

The Supreme Court has repeatedly emphasized that this standard for injury in fact due to threatened harm is not a high bar for the one seeking relief. In *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979), it explained that a credible threat of future enforcement sufficed so long as the threat is not "imaginary or wholly speculative." In *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), it labeled a threat as insufficient only if it were "chimerical." In *Golden v. Zwickler*, 394 U.S. 103, 109 (1969), it specified again that the only threats that fail to confer standing were those that were "wholly conjectural." And the threat of government use of a challenged statute or rule is especially credible when

defendants have not "disavowed enforcement." *Susan B. Anthony List*, 573 U.S. at 165; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (finding plaintiff in constant threat of enforcement despite executive order not currently being enforced). All of these considerations point to the conclusion that Plaintiff Attorneys here have standing: enforcement of the rule may be triggered by anyone who feels aggrieved by their speech, and the State is staunchly defending its desire to implement its new, expanded rule to stamp out unfavored speech considered derogatory. This provides a sufficiently "credible threat" to provide injury in fact. *See Susan B. Anthony List*, 573 U.S. at 159.

The Supreme Court's decision in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), is instructive here. There, parents challenged an allegedly racially discriminatory admissions policy of a public school district, and the school district argued the parents lacked an imminent injury because they would "only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive," such that the racial tiebreaker was triggered. *Id*. at 718-20. The Court rejected this argument, noting that the parents all "have children in the district's elementary, middle, and high schools" that are subject to the policy and, therefore, "*may be* 'denied admission to the high schools of their choice when they apply for those schools in the future'" pursuant to the challenged policy. *Id.* (emphasis

added). The Court explained that the fact that "[some] children of group members will not be denied admission to a school based on their race . . . does not eliminate the injury claimed." Rather, the injury was the violation of constitutional rights on the face of the policy—"being forced to compete in a race-based system." This case has the same posture—Plaintiff Attorneys are subject to a rule that, on its face, violates their constitutional rights and may be wielded against them. *See also TransUnion*, 141 S. Ct. at 2204 (noting that intangible, constitutional harms are concrete and confer standing).

The Fifth and Eighth Circuits have recently demonstrated the correct approach in twin cases challenging federal regulations brought by doctors who, based on religious belief, refuse to provide certain services to transgender youth. DOJ argued that the doctors didn't have standing to complain because the agency had not yet decided whether the regulations covered their conduct. Both circuit courts held that the doctors had standing because of a credible threat of enforcement resulting from the very fact that DOJ said the issue was up in the air. Notably, unlike the district court here, the circuit courts did not factor into their analysis whether the doctors might be successful if they eventually had to defend against enforcement actions. *See Franciscan Alliance v. Bacerra,* 47 F.4th 368, 376 (5th Cir. 2022); *Religious Sisters of Mercy v. Bacerra*, 55 F.4th 583, 603-06

(8th Cir. 2022).  Obviously, here, when enforcement actions may be initiated by the general public, the threat is all the more credible.

Plaintiff Attorneys also have standing because Rule 8.4(7) chills the exercise of their fundamental rights protected by the Constitution, a present and ongoing harm.  When government action substantially burdens the exercise of a constitutional right, that alone constitutes a violation of the right.  *See, e.g., D.C. v. Heller,* 554 U.S. 570, 629 (2008); *see also Lujan,* 504 U.S. at 560 ("invasion of a legally protected interest" equates to injury in fact).  The same principle applies here:  Plaintiff Attorneys desire to speak on topics that foster strong emotions and reactions, and Rule 8.4(7) chills that speech by giving a tool to those who may be offended to enmesh the attorneys in disciplinary investigations and proceedings, even if they may ultimately be vindicated.  For that matter, some who consider themselves aggrieved by certain speech may initiate a complaint under the rule irrespective of whether they believe it has any merit, just to cause the Plaintiff Attorneys annoyance, inconvenience, and hardship.  That, in itself, suffices for injury in fact, because it chills and burdens the exercise by Plaintiff Attorneys of their constitutional rights.

Finally, the district court (slip op. at 23-24 & n.1) improperly brushed aside the examples Plaintiff Attorneys gave in the Complaint of speech that could provoke hostile reaction and use of Rule 8.4(7).  The court reasoned that, because

Plaintiff Attorneys said explicitly only in their opposition to the motion to dismiss that they, too, would make such statements, those examples could be disregarded. The court apparently missed, however, that in their Complaint Plaintiff Attorneys both identified themselves as members of the Connecticut bar and related these examples as statements that "members of the Connecticut bar" would be reluctant to express. Thus, it is only logical to understand that Plaintiff Attorneys were alleging in their Complaint that they might speak on such subjects. This natural reading may not be discarded by procedural technicalities; rather, a court must assume the logical implication of a plaintiff's allegations when considering a motion to dismiss on standing grounds. As the Supreme Court stated in *Lujan*, "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Plaintiff Attorneys more than meet this standard. The cases relied upon by the district court in support are inapposite, as they all deal with attempts in an opposition brief to add distinctly different allegations, not to express the obvious intent of the complaint, as the Plaintiff Attorneys did here.

For these multiple reasons, Plaintiff Attorneys have standing to bring this action. They have an imminent, threatened injury that cannot be calculated by

monetary damages. Their request for declaratory and injunctive relief provides the only effective remedy for them to eliminate the threat to the exercise of their constitutional rights. Indeed, as the Supreme Court emphasized in *TransUnion*, the very purpose of requests for such "forward-looking, injunctive relief" is to "prevent the harm from occurring." 141 S. Ct. at 2210. And, here, as will be illustrated in greater detail below, the threat of attorneys like Plaintiff Attorneys being targeted is very real. The Constitution does not require someone targeted by adverse action to wait to sue until the threatened harm has eventuated. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

II. Recent Events Demonstrate That the
   Threat of Rule 8.4(7) Is Very Real

One does not have to look far to illustrate that the expected harms complained of by Plaintiff Attorneys are not speculative. What is happening to others shows that Rule 8.4(7) is a credible threat to them.

By any measure, Michael McConnell is a legal luminary. An honors graduate of Chicago Law School, he clerked for Chief Judge Skelly Wright of the D.C. Circuit and Justice William Brennan of the Supreme Court. He served as a federal circuit court judge for seven years and is currently a chaired professor and the director of the Constitutional Law Center at Stanford Law School. He has previously held chaired professorships at Chicago and Utah Law Schools and has

been a visiting professor at Harvard and NYU.  He has published extensively, is a noted expert in religious liberty under our Constitution, and has argued sixteen cases before the Supreme Court.[2]  That Court has repeatedly cited his scholarship in its opinions.[3]

But he is on the hot seat. On May 27, 2020, Professor McConnell offended. Here is his recounting of the incident shortly after it occurred:

> On Wednesday, in connection with the debates over ratification of the Constitution in Virginia, I quoted an ugly racial epithet used by Patrick Henry.  I make it a priority in my class to emphasize issues of racism and slavery in the formation of the Constitution, and directly quote many statements by supporters and opponents of slavery.  This was a particularly ugly incident, where the speaker sought to build opposition to the Constitution by stoking the racism of his Virginia audience.  I presented the quotation in its historical context, emphasized that they were not my words, and condemned their use.  It is vitally important to teach the history of the American Founding warts and all, and not to bowdlerize or sugar-coat it.[4]

Some in his class were offended that he would speak out loud the n-word,

---

[2] https://law.stanford.edu/directory/michael-w-mcconnell/ (last visited March 3, 2023).

[3] *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, 140 S. Ct. 2049, 2060 n.9 (2020); *id.* at 2079 (Sotomayor, J., dissenting); *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2258 (2020); *id.* at 2264, 2266 (Thomas, J., concurring); *id.* at 2276 (Gorsuch, J., concurring).

[4] Michael W. McConnell, "Statement to Stanford Law School Community" (May 29, 2020), *found at* https://wustllawreview.org/2021/10/23/statement-by-michael-mcconnell-to-stanford-law-school-community/.

even when quoting its use by another and in historical context, and they called for him to be disciplined by the school. Professor McConnell in his responsive statement pleaded his good intentions: "I hope everyone can understand that I made the pedagogical choice with good will—with the intention of teaching the history of our founding honestly."[5] Then, despite his belief that it is "vitally important . . . not to bowdlerize or sugar-coat" our nation's history, Professor McConnell concluded that he would self-censor forthwith: "in light of the pain and upset that this has caused many students, whom I care deeply about, I will not use the word again in the future."[6]

His self-censorship did not snuff out his problem. It spilled over to Washington University (St. Louis) Law School, as Professor McConnell had been on a panel there earlier in the year and his related paper was to be published in its law review. Some urged the editors of the review not to publish his work because of the Stanford incident, and, although they ultimately decided to do so, the editors prefaced their publication of it with a statement "condemn[ing] Professor McConnell's use of the n-word in the classroom. We believe that the use of this word in the classroom is unacceptable and unnecessary, as it significantly disrupts

---

[5] *Id.*

[6] *Id.*

the learning environment and places a burden on Black students that other students do not face."[7]

Let us use this incident involving Professor McConnell to analyze new Rule 8.4(7). Assuming he had been subject to new Rule 8.4(7), would Professor McConnell be subject to discipline under it for what he said in his classroom? Would his professed innocent intention be enough to insulate him? Whether found guilty or not of violating Rule 8.4(7), could he reasonably be charged under it? Even framing these questions shows that Plaintiff Attorneys' complaint that Rule 8.4(7) is unconstitutional on its face is ripe for review.

Professor McConnell offended some people. Students at his university and at another prestigious law school have accused him of being insensitive, biased, and prejudiced because he quoted derogatory language. How does this match up with Rule 8.4(7)? For our purposes, more than well enough to chill his speech in the future.

Rule 8.4 provides in part,

> It is professional misconduct for a lawyer to:
> . . . .

---

[7] "Statement by the Undersigned Editors of Vol. 97," *found at* https://wustllawreview.org/2021/10/23/statement-by-the-undersigned-editors-of-volume-97/. The law review also published a response by a member of its faculty critical of the statement of the editors. John Inazu, "Scholarship, Teaching, and Protest," *found at* https://openscholarship.wustl.edu /cgi/viewcontent.cgi?article=6469&context=law_lawreview.

> (7) Engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, color, ancestry, sex, pregnancy, religion, national origin, ethnicity, disability, status as a veteran, age, sexual orientation, gender identity, gender expression or marital status in conduct related to the practice of law. . . .[8]

Was Professor McConnell's classroom speech "conduct related to the practice of law"? The comment adopted along with the rule doesn't list classroom teaching expressly, but it does define the "practice of law" as including "professional activities or events in connection with the practice of law," and the bar association requires a law school degree to obtain a license to practice law. If in doubt, then just assume Professor McConnell was teaching a CLE course, which the comment's text undoubtedly covers.

Was Professor McConnell engaging in "conduct"? While some distinguish in some contexts between "speech" and "conduct," a major purpose of the rule is to regulate harassing or discriminatory speech, as the comments make clear. They twice specify that Rule 8.4(7) covers "verbal or physical conduct."[9]

Did Professor McConnell, by quoting that n-word, "know," or should he "reasonably" have known, that he was engaging in "harassment or discrimination"? He certainly was accused of it. And he certainly intended to

---

[8] Conn.R.P.C. 8.4.

[9] *Id.*, cmt.

quote the n-word and had knowledge that many might consider it offensive ("severe," "demeaning," and "derogatory," using the terminology of the official comments to Rule 8.4(7)). But is that the type of general intent that is "knowing" under the rule, or must there be specific intent to harass or discriminate against a particular person? If so, is it enough that Professor McConnell knew that African Americans were listening to his teaching that day, or did he have to know those students individually? The elucidating comments certainly don't clearly answer these questions.

Assuming Rule 8.4(7) applied in Professor McConnell's situation, this should be enough to show that he would have reason to fear that someone might complain under the rule about his quoting the n-word in a law school or CLE classroom. In this context, it is not sufficient to tell him that he should just "stay the course" and "fight for his convictions" about what he identifies as "vitally important" pedagogically for his students because the rule tautologically provides that legitimate expressions protected under the First Amendment are not ultimately going to be sanctioned. He has already promised never to do it again due to the pushback he got, even without the threat of losing his license that Rule 8.4(7) would add to the mix. Similarly, even the threat of the initiation of disciplinary procedures—with their attendant time, trouble, and publicity—chills the speech and conduct of Connecticut lawyers, as Plaintiff Attorneys allege.

And it's not just Professor McConnell who has had a problem of this type. Professor Carrie Menkel-Meadow, professor emerita at Georgetown Law School and professor at the University of California at Irvine School of Law, found herself in a similar situation. As she had in past years without objection, she assigned an article related to hate speech that spelled out the n-word. In 2021, her explanations of her educational purpose in assigning the article were described by the Black Law Students Association as "dangerous and unacceptable" and were criticized for not being appropriately apologetic "for the harm her own usage of the n-word has caused for her own students."[10]

What if Professor McConnell (or Professor Menkel-Meadow or Plaintiff Attorneys) next wishes in one of his classes to criticize the majority opinion in *Obergefell v. Hodges*?[11] Surely that would be beyond complaint, especially as the four Supreme Court justices in dissent roundly criticized it and the theory of judicial decision making it represented.[12] Think again. Justice Parker of the

---

[10] https://www.washingtonpost.com/local/education/ georgetown-law-sandra-sellers-black-students/2021/03/11/c798eae0-827d-11eb-ac37-4383f7709abe_story.html (last visited Mar. 3, 2023).

[11] 576 U.S. 644 (2015).

[12] *See id.* at 686-713 (Roberts, C.J., dissenting); *id.* at 713-20 (Scalia, J., dissenting); *id.* at 721- 36 (Thomas, J., dissenting); *id.* at 736-42 (Alito, J., dissenting).

Alabama Supreme Court, while running for reelection, had the temerity to make just such criticisms in a radio interview. The Southern Poverty Law Center (SPLC), even without a Rule 8.4(7) counterpart on the books in Alabama, filed an ethics complaint against him for his alleged "assault [on] the authority and integrity of the federal judiciary," which prompted an ethics investigation and ensuing litigation.[13]

Of course, in our current climate, it would be no defense for Judge McConnell to say that Frederick Douglass also quoted people who used the n-word—and that Douglass spelled out the whole word in his autobiographies on multiple occasions.[14] That was then, and this is now. Nor is it sufficient to appeal to an objective standard of rationality, reasonableness, or maturity. As social commentator Theodore Dalrymple recently observed:

> attachment to freedom of expression as an ideal seems to have lost much of its salience in the western world, having been replaced as a desideratum by that of virtue, moreover virtue of a peculiar but easily achievable kind, not that of acting well, but that of thinking and expressing the right thoughts. The certifiably right thoughts, which can change in an instant, are

---

[13] *See Parker v. Judicial Inquiry Comm'n of Ala.*, 2017 WL 3820958 (M.D. Ala., Aug. 31, 2017), and 295 F. Supp. 3d 1292 (M.D. Ala. 2018) (enjoining enforcement of state's judicial code of ethics to extent it chilled speech by judges about other than pending cases in the state). The quotation from SPLC's complaint is found at 2017 WL 3820958 at 3.

[14] *See, e.g.*, Frederick Douglass, *Autobiographies* 207 (Library of Am. 1994).

- 16 -

those that are in conformity with the moral enthusiasms of the moment.

. . . .

[T]here is an unmistakable tendency in modern societies to allow the offended person to be the sole judge of the existence of the offence of which he or she is supposedly the victim, or even merely a witness to. Reason or objective evidence doesn't come into it, what counts is how people feel. You're bullied if you say you feel you're bullied; you're insulted if you say you feel you're insulted; you're disrespected if you say you feel you're disrespected; you're discriminated against if you say you feel you're discriminated against; and so forth.[15]

To the same point, an open letter signed by a diverse group of 150 scholars, writers, and artists and published in *Harpers* concluded, "[I]t is now all too common to hear calls for swift and severe retribution in response to perceived transgressions of speech and thought."[16]

All this is to say, it is no idle imagination that believes that Rule 8.4(7) will be used to chill, repress, and punish unpopular speech, including that of Plaintiff

---

[15] Theodore Dalrymple, "Scotland's Emerging Totalitarian Democracy," *found at* https://lawliberty.org/scotlands-emerging-totalitarian-democracy/ (Jan. 6, 2021). A recent, public example was provided by Senator Hirono of Hawaii during the Senate Judiciary Committee hearings on the nomination of now-Justice Barrett. The senator accused her of using discriminatory and objectionable language by using the commonly used term "sexual preference" because some reputedly now find that term "offensive" and "outdated." *Available at* https://www.c-span.org/video/?476316-6/barrett-confirmation-hearing-day-2-part-3 (at 1:08:40ff.) (last visited Mar. 3, 2023).

[16] https://harpers.org/a-letter-on-justice-and-open-debate/ (last visited Mar. 3, 2023).

Attorneys.    These real-life illustrations demonstrate that they have standing to challenge the rule.

III.    The Very Purpose of Rule 8.4(7) Is to Target Those Who Hold
        Sincerely Held Religious Views That Are Scientifically Informed

There can be no doubt that Rule 8.4(7) targets unpopular speech by individuals with views such as those held by Plaintiff Attorneys.  The ABA in adopting the proposed rule on which it is modeled was not shy about stating its purpose:  "There is a need for a cultural shift in understanding."[17]  Of course, the main shift currently perceived to be needed is about such subjects as the advisability of homosexual and transsexual conduct and in what manner the nation's laws and constitutions speak to it.

Not only do many lawyers not wish to be dragged along with this cultural shift, especially by threats to their livelihoods, but who knows where the next shift may lead?[18]  Indeed, an oft-stated purpose of the Free Speech Clause is to allow a

---

[17]    ABA Ethics Committee, Dec. 22, 2015, memo. at 2, *found at*
        https://www.americanbar.org/content/dam/aba/administrative/professional_respo
        nsibility/rule_8_4_language_choice_memo_12_22_2015.authcheckdam.pdf.

[18]    In *Otto v. Boca Raton*, 981 F.3d 854 (11th Cir. 2020), the Eleventh Circuit
        struck down restrictions on licensed counselors who assist patients to resist
        homosexual and transsexual conduct, making such counseling subject to
        sanction.  The court found such restrictions content- and viewpoint-
        discriminatory and violative of the Free Speech Clause.  The court noted that
        views about homosexual conduct had changed considerably over the last few

- 18 -

free exchange of ideas, including ideas that are deemed objectionable at the time by some.[19] Many such ideas have later gained majoritarian favor, such as women's suffrage and labor unions.

The rubber meets the road currently with respect to Rule 8.4(7) because many wish to snuff out the speech of those who still speak consistently with traditional religious teachings concerning homosexual and transsexual behavior, including those of Christianity, by far the most dominant religion in this country. Christians are called to love and serve all persons, including those with a homosexual orientation and those who feel a closer association to a gender other than their biological sex. Christians believe that all persons are of equal worth, but also that one's identity and worth are not tied to sexual activity. Persons are just as much persons if they never engage in sexual intercourse, of whatever kind.

However, most orthodox Christians (and those of other religions) sincerely believe that their Holy Scriptures, as well as biology,[20] identify same-sex

---

decades and could change again. *Id.* at 869-70.

[19] *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (Alito, J., concurring) ("We have said time and again" that speech may not be prohibited "merely because the ideas are themselves offensive to some of their hearers."); *Tex. v. Johnson*, 491 U.S. 397, 414 (1989) (describing as "bedrock principle" and citing multiple cases); *Whitney v. Cal.*, 274 U.S. 357, 375-77 (1927) (Brandeis, J. concurring).

[20] *See, e.g.*, Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8 (Fall 2016), noting (1) that there is limited evidence that social stressors such as

intercourse and rejection of one's birth gender as both unnatural and immoral.[21]

Thus, while Christian lawyers should not (and overwhelmingly do not) refuse to

represent those who identify themselves as gay or transgender *when the work does*

*not involve supporting that lifestyle* (e.g., representation of a gay person who is a

victim of a car accident), many would have ethical qualms in accepting a

representation that advanced the cause of such lifestyles or helped entrench

participation in it, which *conduct* they consider immoral and injurious to both the

individuals involved and society (e.g., representation to argue for insurance

coverage of a transsexual operation).

The orthodox Christian view that distinguishes the identity and worth of the

person from the offensive activity in which the person engages[22] is not generally

---

discrimination and stigma contribute to the elevated risk of poor mental health outcomes for non-heterosexual and transgender populations and (2) that more high-quality longitudinal studies are necessary for the "social stress model" to be a useful tool for understanding public health concerns.

[21] The Supreme Court recognized this in *Lawrence v. Texas*, 539 U.S. 558 (2003), with respect to homosexual practice: "[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." *Id.* at 571.

[22] This is frequently expressed in the aphorism that Christians should "love the sinner and hate the sin." An example is Jesus' dealing with the woman caught in adultery, where he saved her from her captors but told her to "go, and from

accepted by either the LGBT community or, increasingly, administrative and judicial officials.[23]  Christian attorneys often represent citizens who, for religious reasons, have declined to serve LGBT events like same-sex marriages.[24]  The claims of "sexual orientation" or "marital status" or "gender identity" discrimination are broad enough to target not just the clients, but their lawyers.  For example, an Alaska attorney while representing a women's homeless shelter that refused entry to biological men, whatever their expressed gender may be, gave a press interview explaining the shelter's policy.  The local Equal Rights Commission then filed a complaint against him for "publishing" a discriminatory policy.[25]

It takes no great discernment to recognize that Rule 8.4(7) could be used as another tool to punish attorneys who represent disfavored individuals and groups, as well as to discipline those who refused, for ethical reasons, to represent those

---

now on sin no more." *John* 8:2-11 (ESV).

[23]  *E.g., Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 673 (2010) (recounting state university's labeling of CLS chapter's requirement that leaders not engage in sexual intercourse outside marriage between a man and a woman as "sexual orientation" and "religious" discrimination, although the case was decided on other grounds).

[24]  *E.g., Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018).

[25]  *See Basler v. Downtown Hope Ctr.*, Case No. 18-167 (Anchorage Equal Rights Comn'n, May 15, 2018).

who wish to advance the LGBT agenda. And, of course, this endangers not just Christian attorneys, but also those of the two other major faiths in this country, Judaism and Islam, which also teach the immorality of homosexual conduct. It even endangers some secular feminists and lesbians, who are currently facing hostility because of their commitment to the truth that "woman" exclusively means "an adult human female" and does not include biological men, no matter what their beliefs about their gender identity.[26] It is part of the reason why most states that have considered the new rule have refused, on constitutional grounds, to adopt it as proposed by the ABA and largely adopted by Connecticut. The attorneys general of six states (Alaska, Arizona, Louisiana, South Carolina, Tennessee, and Texas) have declared the model rule to be unconstitutional in various respects,[27] as has the

---

[26] *See, e.g.*, Caroline Lowbridge, "We're being pressured into sex by some transwomen" (Oct. 26, 2021), *found at* https://www.bbc.com/news/uk-england-57853385 (last visited Mar. 3, 2023) (reporting on phenomenon of lesbians being accused of being transphobic because of their disinclination to have sexual relations with "trans women" who still have male genitalia).

[27] *See* https://www.law.state.ak.us/pdf/press/190809-Letter.pdf (Alaska); https://www.clsnet.org/document.doc?id=1145 (Arizona); https://lalegalethics.org/wp-content/uploads/2017-09-08-LA-AG-Opinion-17-0114-re-Proposed-Rule-8.4f.pdf?x16384 (Louisiana); https://www.scag.gov/wp-content/uploads/2017/05/McCravy-J.-OS-10143-FINAL-Opinion-5-1-2017-01331464xD2C78-01336400xD2C78.pdf (South Carolina); https://www.tn.gov/content/dam/tn/attorneygeneral/documents/ops/2018/op18-11.pdf (Tennessee); and https://www.2.texasattorneygeneral.gov/opinions/opinions/51paxton/op/2016/kp0123.pdf (Texas).

Supreme Court of Idaho in a unanimous recent opinion rejecting a proposed rule based on ABA Rule 8.4(g),[28] and scholars have also widely adjudged the model rule to be defective.[29]

The view that distinguishes the person from the activity may be rejected by the LGBT community, but it is held by many lawyers in Connecticut and nationwide, and it is supported by longstanding and well considered religious, scientific, and logical arguments. Indeed, to some degree, this view has informed legislators at all levels of our government—from federal to local—in rejecting the addition of "sexual orientation," "gender identity," and "gender" to many non-discrimination laws and policies.[30] Adding them as Connecticut has done to its

---

[28] *In re Idaho State Bar Resolution 21-01* (Idaho S. Ct., Jan. 20, 2023), *available at* http://isc.idaho.gov/opinions/50356.pdf (lasted visited Mar. 3, 2023).

[29] *See, e.g.*, Michael McGinniss, *Expressing Conscience with Candor: Saint Thomas More and First Freedoms in the Legal Profession*, 42 Harv. J.L. & Pub. Pol'y 173 (2019); Josh Blackman, Response to ABA Formal Opinion 493 on Model Rule 8.4(g), *found at* https://reason.com/2020/ 07/15/aba-issues-formal-opinion-on-purpose-scope-and-application-of-aba-model-rule-8-4g/ (July 15, 2020); Eugene Volokh, *A Nationwide Speech Code for Lawyers?*, The Federalist Society (May 2, 2017), *found at* https://www.youtube.com/watch ?v=AfpdWmlOXbA; Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics: The Lawyer's Deskbook on Professional Responsibility*, "§ 8.4-2(j) Racist, Sexist, and Politically Incorrect Speech" & "§ 8.4-2(j)-2. The New Rule 8.4 and the Free Speech Problems It May Raise" in "§ 8.4-2 Categories of Disciplinable Conduct" ("The ABA's efforts are well intentioned, but . . . raise problems of vagueness, overbreadth, and chilling protected speech under the First Amendment.") (Apr. 2017 ed.).

[30] To date, only 21 states have added full LGBT protections state-wide. *See*

Rules of Professional Conduct via Rule 8.4(7) gives those who oppose the message and beliefs of those lawyers like plaintiffs a weapon to try to shut them down and deprive them of their livelihood.

Conclusion

Plaintiff Attorneys have more than adequately alleged that Rule 8.4(7) chills and unconstitutionally targets their likely speech, making them subject to investigation and potential sanction. The district court inappropriately dismissed for lack of standing and should be reversed.

Respectfully submitted,

/s/ Kevin T. Snider
Kevin T. Snider
Counsel of Record for *Amici Curiae*
Pacific Justice Institute
P.O. Box 276600
Sacramento, CA 95827
(916) 857-6900
ksnider@pji.org

March 3, 2023

---

https://freedomforallamericans.org/states/ (last visited Mar. 3, 2023).

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of F.R.A.P. 32(a)7(B)(i) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions, this brief contains 5,749 words, including footnotes, in 14-point Times New Roman font. This total was calculated with the Word Count function of Microsoft Office Word 365.


/s/ Kevin T. Snider
Kevin T. Snider
    Counsel of Record for *Amici Curiae*
Pacific Justice Institute
P.O. Box 276600
Sacramento, CA 95827
(916) 857-6900
ksnider@pji.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2023, I served the foregoing Brief *Amici Curiae* of The National Legal Foundation, *et al.*, on all parties or their counsel of record through the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service on those participants will be accomplished by the CM/ECF system.


/s/ Kevin T. Snider
Kevin T. Snider
   Counsel of Record for *Amici Curiae*
Pacific Justice Institute
P.O. Box 276600
Sacramento, CA 95827
(916) 857-6900
ksnider@pji.org